**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MCKENZIE GRAY,**

                         **Plaintiff,**

**v.**                                                    **5:16-CV-973 (NAM/TWD)**

**ONONDAGA-CORTLAND-**
**MADISON BOCES,**

                         **Defendant.**
_____

**Appearances:**

James D. Hartt, Esq.
6 N. Main Street, Suite 200F
Fairport, New York 14450
*Attorney for Plaintiff*

Charles C. Spagnoli, Esq.
6575 Kirkville Road
East Syracuse, New York 13057
*Attorney for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff McKenzie Gray brings this action under the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 *et seq*., and Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e to 2000e-17, asserting claims against Defendant Onondaga-

Cortland-Madison Board of Cooperative Education Services ("BOCES") for disability

discrimination, failure to accommodate, and retaliation.  (Dkt. No. 1)  Now before the Court is

Defendant's motion for summary judgment, (Dkt. Nos. 56, 65), and Plaintiff's papers in opposition, (Dkt. No. 64). For the reasons that follow, Defendant's motion is granted.

## II. BACKGROUND[1]

### A. Plaintiff's Employment at BOCES

BOCES provides shared educational programs and services to students from school districts within a three-county region of Central New York. (Dkt. No. 1, ¶ 7). Plaintiff was hired by BOCES as a part-time teaching assistant in 2012. (Dkt. Nos. 56-25, ¶ 7; 64-19, ¶ 7). Plaintiff remained in that position throughout her employment at BOCES. (Dkt. No. 56-5, p. 3). Plaintiff's job duties required her to interact with students with emotional and behavioral disabilities. (Dkt. Nos. 56-25, ¶ 11; 64-19, ¶ 11). She was responsible for helping manage students' behavior, assisting with classroom lessons, and otherwise following the classroom teacher's direction and instructions. (Dkt. No. 56-5, p. 4). Plaintiff was typically assigned to certain classrooms on a yearly basis. (*Id.*, p. 5). Her work hours were 8:00 a.m. to 3:00 p.m. (*Id.*, p. 8).

### B. Plaintiff's Disabilities

Plaintiff has Hashimoto's disease, an autoimmune disorder that affects the thyroid gland. (Dkt. Nos. 56-25, ¶ 12; 64-19, ¶ 12). Plaintiff testified that her condition can cause exhaustion and muscle pain, and can affect her mood, metabolism, and her ability to regulate her body temperature. (Dkt. No. 56-5, p. 12). She stated that her condition can cause pain in her back and neck when she becomes stressed. (*Id.*, p. 13). Plaintiff testified that she was able to perform her job duties as a teaching assistant despite her Hashimoto's disease. (*Id.*, p. 14).

---

[1] The facts have been drawn from Defendant's statement of material facts, (Dkt. No. 56-25), Plaintiff's response and counterstatement of material facts, (Dkt. Nos. 64-18, 64-19), and the parties' attached exhibits, depositions, and declarations (*see generally* Dkt. Nos. 56, 64, 65).

She also claimed that her medical condition could require accommodation for the physical parts of the job, such as lifting or restraining destructive, violent, or aggressive students. (*Id.*).

Plaintiff informed BOCES of her Hashimoto's disease in 2013 on an application for a summer school position, and again in an e-mail about a medical appointment in February 2015. (Dkt. No. 56-5, pp. 16–17). Plaintiff took medical leave for her Hashimoto's disease from October 22, 2014 to November 5, 2014. (Dkt. No. 56-8). Plaintiff was not disciplined or terminated for taking that leave. (Dkt. No. 56-5, p. 19).[2]

### C. Misconduct Investigation

On March 27, 2015, J.M., a minor student in the classroom where Plaintiff was assigned, reported to the classroom social worker, Timothy Hummell, that he and another student, J.C., recently had problems with Plaintiff. (*See generally* Dkt. No. 56-17). During one incident, J.M. alleged that he and J.C. were sitting together on a school bus when Plaintiff attempted to sit in the same seat with them. (*Id.*, p. 1). J.M. reported that when he and J.C. did not allow Plaintiff to sit with them, she called them "little assholes." (*Id.*). During a separate incident, J.M. reported that he was alone in Mr. Hummel's office when Plaintiff "came in and shut the door." (Dkt. No. 56-21, ¶ 6; *see also* Dkt. No. 56-17, p. 2). J.M. claimed that Plaintiff asked him why he didn't like her, and then she blocked him from exiting the office when he tried to leave. (*Id.*).

That same day, Mr. Hummel reported these incidents to the BOCES Principal, Beth Cooper, the other classroom social worker, Renee Fragale, and the classroom teacher, Courtney Tianello. (Dkt. No. 56-17, pp. 2, 4). Ms. Tianello told Mr. Hummel that she had

---

[2] In addition to Hashimoto's disease, Plaintiff also suffers from Post-Traumatic Stress Disorder ("PTSD"). (Dkt. No. 56-5, p. 15). Plaintiff never informed BOCES about her PTSD diagnosis. (Dkt. Nos. 56-25, ¶ 20; 64-19, ¶ 20; *see also* Dkt. No. 56-5, p. 76).

received text messages from Plaintiff stating "that [Plaintiff] was feeling uncomfortable being alone" with J.M. and J.C. (*Id.*, p. 3). Mr. Hummel met with Plaintiff to discuss the incidents, at which time Plaintiff reported that she had received inappropriate notes from J.M. of a sexual nature. (*Id.*, p. 2). J.M. later admitted to Mr. Hummel that he wrote the notes. (*Id.*, p. 3). Mr. Hummel "informed [Plaintiff] that she should avoid being around [J.M. and J.C.]" and met with Plaintiff to "debrief about her interactions" and "discuss appropriate boundaries." (*Id.*).

Also on March 27, 2015, Ms. Fragale notified the BOCES Assistant Director of Special Education, Karen Koch, about certain comments that were made to Plaintiff by J.M. and J.C. (Dkt. No. 56-22, ¶ 4). Assistant Director Koch then met with Plaintiff and BOCES Principal, Beth Cooper, to investigate the issues raised by Ms. Fragale's report. (*Id.*, ¶ 5). During that meeting, Plaintiff described the comments that were made by students in the classroom. (*Id.*). Assistant Director Koch recalled that Plaintiff reported that she had spoken with Ms. Fragale about her concerns, that Ms. Fragale had addressed the comments with the students, and that she felt comfortable returning to the classroom. (*Id.*). Assistant Director Koch told Plaintiff that the comments were not acceptable, and that Plaintiff should bring further concerns directly to her or Principal Cooper. (*Id.*, ¶ 6).

Assistant Director Koch told Plaintiff that she would ensure that "the students received appropriate consequences," and informed Plaintiff that she would be assigned to a new classroom "for her own protection from any inappropriate comments." (*Id.*). She reported that Plaintiff then "raised strong objections to being removed to another classroom and began downplaying the issues" with the students. (*Id.*, ¶ 7). According to Plaintiff, she informed Assistant Director Koch and Principal Cooper that she "enjoyed being in that classroom," and that she did not want to be reassigned. (Dkt. No. 56-5, pp. 57–58). Plaintiff claimed that "if

[the students'] comments and actions were addressed, [ ] in a meeting with [her] and the two boys [about] what's appropriate and what's not, this whole thing could have been avoided." (*Id.*).

Assistant Director Koch recalled that "Plaintiff's sudden reversal of her position when told she would be moved to another classroom for her own protection heightened [her] concerns, [because] it appeared Plaintiff was trying to remain in the classroom with J.M. and J.C. and opposing any suggestion that she was uncomfortable with the students' comments." (Dkt. No. 56-22, ¶ 19). Assistant Director Koch also brought up other performance issues with Plaintiff, including Plaintiff's text messages to Ms. Tianello about Mr. Hummel in which she claimed he was a "terrible" social worker. (*Id.*, ¶ 8). She also told Plaintiff that she had to report to work on time, and that she had received reports and noticed herself that Plaintiff reported to work "late on virtually a daily basis by thirty to forty-five minutes, even though Principal Cooper had spoken to her about the problem." (*Id.*, ¶ 9). According to Assistant Director Koch, Plaintiff claimed she was "having personal problems" that were preventing her from getting to work on time, but "Plaintiff did not say anything suggesting the problems were medical in nature or related to any disability." (Dkt. No. 56-22, ¶ 9; Dkt. No. 56-5, pp. 61–62). Assistant Director Koch encouraged Plaintiff to utilize the employee assistance program if necessary, and reminded Plaintiff that she was expected to arrive to work on time, and that she was not permitted to text colleagues during school hours. (Dkt. No. 56-22, ¶¶ 9–10; Dkt. No. 56-5, pp. 60–61, 63).

Assistant Director Koch recalled that Plaintiff "continued to act extremely upset," so she told Plaintiff that she "could sit in [her] office until she felt calm, or that she could go home if she felt she was too upset to return to the classroom." (Dkt. No. 56-22, ¶ 10). She instructed

Plaintiff "not to return to the classroom while emotional as it would be upsetting for the students to see her." (*Id.*). Shortly afterward, Assistant Director Koch received a call informing her that Plaintiff had "gone into the classroom crying and upset the students, that she was repeatedly texting the classroom teacher, and that she had returned to [Assistant Director Koch's] office." (*Id.*, ¶ 12). Assistant Director Koch then returned to her office with a union representative and told Plaintiff that she needed to go home. (*Id.*, ¶ 15). Plaintiff admits that she was told to go home but insists that she was not upset at the time she returned to the classroom. (Dkt. No. 56-5, pp. 66–67).

At the end of the school day on March 27, 2015, Assistant Director Koch met with Principal Cooper, Ms. Fragale, Mr. Hummel, and Ms. Tianello to evaluate the ongoing issues with Plaintiff. (Dkt. No. 56-22, ¶ 16). She was "greatly concerned" by the reports she received "as it appeared that Plaintiff was not maintaining appropriate boundaries with the two students, that she was directing inappropriate comments at them, that she was undermining the classroom social workers, and that the management of the classroom in general was a serious problem." (*Id.*, ¶ 18). After the meeting, Assistant Director Koch investigated further and received additional reports from J.C., Mr. Hummell, and Christina Gonzalez, the other teaching assistant in the classroom. (*Id.*, ¶¶ 21–23).

On the morning of March 30, 2015, Assistant Director Koch met with several other school administrators, including BOCES District Superintendent, Jody Manning, and Director of Labor Relations, Mark Pettitt. (*Id.*, ¶ 24). According to Assistant Director Koch, it was at that point that "[w]e decided we were not going to have Plaintiff continue in employment due to her poor judgment, unprofessional behavior, insubordination, and other misconduct." (*Id.*).

### D. Plaintiff's Notice of Medical Leave

On March 30, 2015, Plaintiff delivered a doctor's note to Principal Cooper's office indicating that she had a "medical" illness and would need to be out of work from March 31, 2015 through May 4, 2015. (Dkt. Nos. 56-5, p. 71; 64-15, p. 2). Plaintiff testified that she needed medical leave because of the recent work-related "emotional triggers" and "stress" that could exacerbate the symptoms of her disabilities. (Dkt. No. 56-5, pp. 69, 72).

According to Mr. Pettitt, BOCES administrators made the decision to terminate Plaintiff's employment during a meeting on the morning of March 30, 2015, and the meeting "was finished and the decision was made before Plaintiff presented to [ ] BOCES any doctor's note requesting time off for medical reasons, which occurred after lunch." (Dkt. No. 56-24, ¶ 3). Mr. Pettitt was responsible for setting up a personnel meeting between Plaintiff and administrators, which he had not done before Plaintiff delivered her notice for medical leave. (Dkt. No. 65-2, ¶¶ 2, 5). According to Mr. Pettitt, once the administrators decided to terminate Plaintiff, he "had no authority to refrain from terminating Plaintiff, regardless of whether she requested medical leave of finite or indefinite duration." (*Id.*, ¶ 8).

On March 31, 2015, Mr. Pettitt called Plaintiff and asked her to attend a personnel meeting on April 1, 2015, where he intended to offer Plaintiff an opportunity to respond to the allegations and to resign in lieu of termination if she preferred. (Dkt. No. 56-24, ¶ 5). According to Mr. Pettitt, Plaintiff asked him to arrange for union representation to be present at the meeting. (*Id.*, ¶ 6; *see also* Dkt. No. 56-5, p. 74).

Plaintiff testified that, after speaking with Mr. Pettitt, she "reached out to the union," who "advised [her] that [she] didn't need to attend the meeting if [she] was on leave." (Dkt.

No. 56-5, pp. 73–74). She also contacted her doctor, who told her that she was approved to be out of work, including for "work-related meetings." (*Id.*, p. 75).

At 8:30 a.m. on April 1, 2015, Plaintiff e-mailed Mr. Pettitt informing him that she was unable to attend "work or work related meetings." (Dkt. No. 56-12). She informed Mr. Pettitt that her doctor would be sending a follow-up note clarifying her work limitations. (*Id.*). Plaintiff's doctor then faxed a new note to BOCES stating that he had "taken Ms. Gray out of work pending further evaluation," and adding, "I do not want her attending any disciplinary meetings." (Dkt. No. 56-14). Plaintiff did not attend the meeting. (Dkt. No. 56-5, p. 79).

### E. Plaintiff's Termination

On April 2, 2015, District Superintendent Jody Manning sent Plaintiff a letter stating that her employment at BOCES was "terminated effective Wednesday, April 1, 2015." (Dkt. No. 64-9, p. 2). The termination letter further states that "we attempted to review the reasons for this action with you at a meeting that had been scheduled for April 1. You declined to attend this meeting due to medical reasons." (*Id.*).

BOCES had already terminated the classroom teacher, Ms. Tianello, on March 27, 2015 for her own involvement in the inappropriate texting with Plaintiff during school hours. (Dkt. Nos. 56-22, ¶ 20; 56-5, p. 81; 64-3, p. 14).

### F. NYSDHR Determination

On June 30, 2015, Plaintiff filed a complaint against Defendant with the New York State Division of Human Rights ("NYSDHR") claiming that she was subjected to unlawful discriminatory practices because of her disability, sex, and her opposition to discrimination and retaliation in the workplace. (Dkt. Nos. 64-3, pp. 1–2). On December 5, 2015, a NYSDHR

evaluator issued a determination finding that there was "probable cause to support the allegations of the complaint." (*Id.*, p. 6). Plaintiff then commenced this action.

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the

non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. DISCUSSION

Following the Court's order on Defendant's motion for judgment on the pleadings, (Dkt. No. 21), the parties agree that Plaintiff has four remaining claims: (1) disability discrimination; (2) failure to accommodate her disability; (3) retaliation for taking disability-related medical leave; and (4) retaliation for her complaints of sexual harassment. (Dkt. Nos. 56-26, pp. 9–10; 64, p. 4). The first three fall under the ADA, the fourth under Title VII.

In moving for summary judgment, Defendant argues that: (1) Plaintiff cannot make out a prima facie case of disability discrimination or retaliation under the ADA, or retaliation under Title VII; (2) even if she did, Defendant has advanced a legitimate, non-discriminatory and non-retaliatory reason for Plaintiff's termination; and (3) Defendant did not fail to accommodate Plaintiff because she never sought any accommodations due to her disability. (*See generally* Dkt. No. 56-26). The Court will assess each claim in turn.

### A. ADA Discrimination

Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In general, a plaintiff can allege disability discrimination under one of three theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation. *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

Claims alleging intentional discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). First, Plaintiff must establish a prima facie case of discrimination under the ADA. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Second, if an employee establishes a prima facie case, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and [third] the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.*

### 1. Prima Facie Case

Defendant argues that Plaintiff cannot establish a prima facie case because she has offered no evidence to raise an inference of discriminatory intent. (Dkt. No. 56-26, pp. 15–16). In support of this argument, Defendant notes that: (1) it had notice of Plaintiff's Hashimoto's disease since the summer of 2013; (2) it had previously allowed Plaintiff medical leave for her disability; (3) BOCES "believed in good faith that Plaintiff had engaged in substantial

misconduct justifying her termination"; and (4) Plaintiff was treated the same as a non-disabled employee, who was discharged at approximately the same time for less misconduct. (*Id.*).

In response, Plaintiff contends that she has established a "strong inference of a causal connection between her disability, and related medical leave . . . , and [her] termination that Defendant issued a short time later." (Dkt. No. 64, p. 12). Specifically, she claims that she informed BOCES of her disability on February 27, 2015, and then was "terminated very shortly after Defendant learned her doctor had taken her out, showing temporal proximity . . . and a causal nexus between her need for time off (a reasonable accommodation) and her termination." (*Id.*).

In order to establish a prima facie case of intentional discrimination under the ADA, a plaintiff must show that: (1) the defendant is subject to the ADA; (2) plaintiff suffers from a disability within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability. *McMillan*, 711 F.3d at 125 (citing *Sista*, 445 F.3d at 169). Plaintiff's burden at the prima facie stage is *de minimis*. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

There is no dispute as to the first three elements: that BOCES is subject to the ADA, that Plaintiff suffers from Hashimoto's disease—a disability within the meaning of the ADA, and that Plaintiff was generally capable of performing essential functions of the job. (Dkt. Nos. 56-26, pp. 15–16; 64, pp. 11–13). Therefore, the only remaining question as to the prima facie case is whether Plaintiff suffered an adverse employment action because of her disability.

To make this connection, a plaintiff must demonstrate that she "suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent."

*Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015) (citation omitted). A plaintiff can establish an inference of discrimination in various ways, such as direct proof of "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). Without any direct proof, the "timing or sequence of events leading to the plaintiff's termination" can be a circumstance that gives rise to an inference of discrimination. *Id.*

Here, Plaintiff relies on evidence of temporal proximity. She has shown that she presented a doctor's note to BOCES on March 30, 2015, which called for a month-long medical leave. (Dkt. No. 56-13). It is undisputed that BOCES terminated Plaintiff's employment just two days after she submitted notice of medical leave. (Dkt. No. 56-15). Defendant argues that the decision to terminate Plaintiff's employment was made before she submitted the doctor's note. (Dkt. No. 56-26, p. 16). However, given the *de minimis* burden at the prima facie stage, Plaintiff's evidence of temporal proximity is enough to permit an inference of discriminatory intent. *See, e.g.*, *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 251 (D. Conn. 2019) (finding that the plaintiff's termination less than two weeks after a medical emergency was sufficient to establish a prima facie case of discrimination); *Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) (holding that "temporal proximity may be sufficient to show a prima facie case") (collecting cases); *Pellegrino v. Cnty. of Orange*, 313 F. Supp. 2d 303, 315 (S.D.N.Y. 2004) (finding that temporal proximity between the plaintiff's announcement of her pregnancy and the process of her termination was sufficient to establish a prima facie case of employment discrimination).

## 2. Legitimate, Non-Discriminatory Reason

Since Plaintiff has established a prima facie case of disability discrimination with respect to Defendant's decision to terminate her employment, the burden now shifts to Defendant to demonstrate a legitimate, non-discriminatory reason for the adverse action. *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Defendant points to evidence that the decision was based on legitimate, non-discriminatory reasons, including: (1) Plaintiff's exchange of text messages with the classroom teacher throughout the school day, including messages that criticized and mocked the classroom social worker and students in the class (Dkt. Nos. 56-11; 56-22, ¶¶ 16–17); (2) corroborated reports from the classroom social workers that Plaintiff had not maintained appropriate boundaries with students (Dkt. Nos. 56-17; 56-18); and (3) failure to comply with Assistant Director Koch's directives not to return to the classroom in an upset and emotional state (Dkt. No. 56-22, ¶¶ 10, 12–15). This evidence supports Defendant's contention that Plaintiff was terminated for misconduct and acting unprofessionally in the classroom—a legitimate, non-discriminatory reason for termination. Therefore, Defendant has satisfied its burden at the second step, and the burden now shifts back to Plaintiff to show that these reasons were pretextual and that disability discrimination was the but-for cause of her termination.

### 3. Pretext & Causation

A plaintiff's burden at the third step of the *McDonnell Douglas* analysis is to "show that the [defendant's] proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Sista*, 445 F.3d at 173 (citation omitted). Generally, to demonstrate pretext, "plaintiff[s] may rely on evidence comprising [their] prima facie case,

including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). In addition, to survive summary judgment the plaintiff must show a genuine issue of fact that her disability was the *but-for* cause of the adverse action. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) ("the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action").!

Here, Plaintiff argues that the "temporal proximity between Plaintiff's submission to Defendant of her Doctor's note and her subsequent termination from employment [is] such that a nexus between her medical leave and her termination has been shown." (Dkt. No. 64, p. 10). She further claims that "the absence of any prior concerns or discipline as against Plaintiff speaks volumes," and adds that "[i]t is telling that the Defendant did not seek [to] discipline Plaintiff for her alleged transgression that it now claims led to her termination prior to finding out about her need for a medical leave prescribed by her doctor." (*Id.*). Plaintiff also suggests that Defendant's unlawful motive is demonstrated by Principal Cooper's alleged questioning about whether Plaintiff was suffering from Hashimoto's Disease and "whether [she] was being honest about a medical appointment" on February 27, 2015." (*Id.*, p. 15).

In response, Defendant asserts that its decision to terminate Plaintiff was made prior to her leave request, and furthermore, that Plaintiff may not rely solely on temporal proximity between her leave and her termination to establish pretext. (Dkt. No. 65-4, pp. 6–9). Defendant contends that since it has "offered significant and, indeed, not-validly-disputed evidence that Plaintiff engaged in substantial misconduct prompting her termination, Plaintiff's reliance on temporal proximity is inadequate to withstand summary judgment." (*Id.*, p. 9).

After careful review of the record, the Court finds that Plaintiff has failed to meet her burden at the third stage of the analysis. Although the temporal proximity between Plaintiff's doctor's note and termination provides an inference of potential discrimination, it is not enough on its own to overcome Defendant's well-documented non-discriminatory reasons for the decision in this case. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932–33 (2d Cir. 2010) (stating that "temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext"); *see also Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) ("Temporal proximity may be sufficient to show a prima facie case, but it is insufficient to demonstrate pretext.").

As evidence of causation, the close temporal proximity is also undermined and all but negated by the undisputed evidence that BOCES administrators started the investigation into Plaintiff's alleged inappropriate and unprofessional conduct *before* she submitted notice of her medical leave. (Dkt. No. 56-22, ¶¶ 4–20). BOCES administrators testified that the investigation began on March 27th and the decision to terminate Plaintiff's employment was made on the morning of March 30th, which was *before* she submitted notice of medical leave. (*Id.*, ¶¶ 4–27; Dkt. No. 56-24, ¶¶ 2–4). Mr. Pettitt, who was responsible for scheduling a meeting for administrators to notify Plaintiff of her termination, had not yet reached out to Plaintiff to set up that meeting when she delivered the doctor's note. (Dkt. No. 65-2, ¶ 5). Plaintiff has offered no evidence to rebut Defendant's timeline of events. And contrary to Plaintiff's claims, the fact that Defendant investigated the allegations of misconduct against her does not permit an inference of a discriminatory motive.[3]

---

[3] Indeed, Defendant would have a duty to investigate allegations of misconduct by any of its employees. Plaintiff's claim about Principal Cooper's supposed "skepticism" about Plaintiff's disability and February 27th medical appointment is also unavailing. Plaintiff's deposition testimony shows that Principal Cooper did not express doubt about whether Plaintiff had a disability, but rather she questioned

Aside from temporal proximity, Plaintiff has not presented any evidence to connect her disability to the decision to terminate her employment. To the contrary, the record shows that BOCES was aware of Plaintiff's Hashimoto's disease as early as 2013 (Dkt. Nos. 56-25, ¶ 13; 64-19, ¶ 13; 56-5, p. 17), and she had previously taken medical leave for her disability without objection or consequence, (Dkt. No. 56-5, pp. 18–19). It is also notable that Plaintiff received the exact *same* treatment as Ms. Tianello (the classroom teacher), who engaged in inappropriate texting throughout the workday. Importantly, Ms. Tianello, who does not suffer from a disability, was terminated as part of the same investigation and at approximately the same time as Plaintiff. (*See* Dkt. No. 56-22, ¶¶ 17–20; Dkt. No. 64-3, p. 14). Thus, there is no evidence that Plaintiff was treated differently than co-workers that did not have disabilities, and any possible causal connection between Plaintiff's disability and her termination is refuted by the fact that Ms. Tianello received the same treatment. *See Mancini*, 411 F. Supp. 3d at 255 (granting summary judgment on discrimination claim where the plaintiff failed to "point to any evidence that she was treated differently from other similarly situated, non-disabled persons"); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 575 (S.D.N.Y. 2010) (granting summary judgment on discrimination claim where, *inter alia*, the plaintiff provided "no evidence that any other employees who were consistently cited for ongoing issues of poor performance did not suffer the same treatment as that directed towards him"); *see also Lopez v. Hollisco Owners' Corp.*, 147 F. Supp. 3d 71, 78–79 (E.D.N.Y. 2015) (finding the plaintiff

---

whether Plaintiff had an appointment on that specific day. (Dkt. No. 56-5, p. 67). Plaintiff admitted that she did not inform BOCES of the appointment until the morning of, and even then, she informed BOCES about the appointment 48 minutes after the school day began. (*Id.*, p. 21). Plaintiff was neither disciplined nor terminated for her medical absence that day. (*Id.*, p. 22). Principal Cooper denies that she ever expressed doubt about Plaintiff's Hashimoto's disease. (Dkt. Nos. 56-22, ¶ 11; 56-20, ¶ 2). Accordingly, Plaintiff's claim that Principal Cooper questioned whether Plaintiff had a disability is belied by her own testimony and the undisputed facts, and therefore, does not provide any evidence of a discriminatory motive.

could not show pretext where, *inter alia*, there was "no evidence that any other employee would be, or was, treated differently"), *aff'd*, 669 F. App'x 590 (2d Cir. 2016).

In sum, Plaintiff has failed to adduce evidence that reasonably supports a finding of discriminatory intent based on her disability. Defendant's explanation that Plaintiff was terminated because of her misconduct is consistent throughout the record and supported by sworn statements from numerous BOCES employees. (*See generally* Dkt. Nos. 56-20; 56-22; 56-23; 56-24). Plaintiff has failed to counter this explanation, particularly since the record demonstrates that the decision to terminate her employment was made before her doctor's note, and Ms. Tianello was terminated for the same misconduct. Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Defendant's reasons were pretextual and that Plaintiff's disability was the but-for cause of her termination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA discrimination claim. *See El Sayed*, 627 F.3d at 932–33 (affirming the dismissal of the plaintiff's discrimination claim where "[the plaintiff] produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual"); *see also Graham v. Three Village C. Sch. Dist.*, No. 11-CV-5182, 2013 WL 5445736, at *26, 2013 U.S. Dist. LEXIS 143264, at *87 (E.D.N.Y. Sept. 30, 2013) (granting summary judgment on discriminatory discharge claim where the plaintiff "point[ed] to nothing in the record from which a rational jury could find her termination was 'because of' her hip impairment, or that the District's underlying motive to terminate her was attributable to a discriminatory intent, and not to her job performance," and there was "uncontroverted evidence that plaintiff was not the only employee who was denied tenure at the conclusion of her probationary period"). !

### B. ADA Failure to Accommodate

Plaintiff alleges that she was denied access to requested lunch breaks "as an accommodation for her qualified disability so as to attend to the symptoms of her Hashimoto's disease." (Dkt. No. 1, ¶ 18). Plaintiff also claims that Defendant denied her disability-related accommodations by terminating her employment rather than permitting her to take the medical leave directed by her doctor. (Dkt. No. 64, p. 16).

Defendant argues that Plaintiff's failure to accommodate claims "fail because she did not indicate she needed lunch breaks due to disability, she did not seek leave because of disability and the leave would not allow her to perform her job." (Dkt. No. 56-26, pp. 18–22). Defendant also asserts that Plaintiff's misconduct and termination "had nothing to do with her alleged disability or disabilities." (*Id.*, pp. 19–22).

In response, Plaintiff claims that her accommodation requests for lunch breaks and medical leave were "reasonable" and necessary due to "ongoing stresses at work which were worsening [her] symptoms." (Dkt. No. 64, p. 15). Plaintiff further argues that, rather than working with her to establish acceptable accommodations, "Defendant terminated [her] pre-textually [sic] for 'performance issues', when that in fact [sic], Defendant fired Plaintiff to avoid paying her while she was out on leave." (*Id.*, p. 16).

Under the ADA, employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie failure to accommodate claim, a plaintiff must demonstrate that: (1) [the] plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his [or her] disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential

functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan*, 711 F.3d at 125–26. Here, the parties only dispute the last element. (*See* Dkt. Nos. 56-26, pp. 18–22; 64, pp. 13–16).

An accommodation request "contemplate[s] an ongoing, informal, and interactive process that 'should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Quadir v. New York State Dep't of Labor*, 39 F. Supp. 3d 528, 539–40 (S.D.N.Y. 2014) (quoting 29 C.F.R. § 1630.2). "[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Gingold v. Bon Secours Charity Health Sys.*, 768 F. Supp. 2d 537, 543 (S.D.N.Y. 2011) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006)). While a formal written request is not required, the request "must be sufficiently direct and specific to give the employer notice of the needed accommodation." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 18–19 (2d Cir. 2015) (citation omitted). In other words, an employer cannot be said to have refused an accommodation if no request was ever made. *Id.* So, "[w]hat matters . . . are not formalisms about the manner of the request, but whether the [requestor or his representative] provides the [requestee] with enough information that, under the circumstances, the [requestee] can be fairly said to know of both the disability and desire for an accommodation." *Quandir*, 39 F. Supp. 3d at 540 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).

Here, with regard to the requested lunch breaks, Plaintiff has failed to adduce evidence that she ever informed her supervisors that those requests were related to her disability and necessary for her to perform her job. (*See* Dkt. No. 64, pp. 13–16). Indeed, Plaintiff does not

identify when or to whom she directed her requests. (*Id.*).[4] Principal Cooper testified that she did not remember Plaintiff ever asking for breaks or lunch breaks. (Dkt. No. 56-6, p. 7). Moreover, Plaintiff testified that the only disability-related accommodations she needs for Hashimoto's disease is help with physical aspects of the job, including restraining and lifting aggressive or violent students. (Dkt. No. 56-5, p. 14). Plaintiff has not claimed that Defendant ever denied any accommodation related to the physical aspects of her work at BOCES.

In sum, even if Plaintiff did request breaks and Defendant denied them, there is no evidence that BOCES knew or should have known that the request was necessary to accommodate Plaintiff's disability. Thus, Plaintiff has failed to establish a prima facie case as to the alleged break accommodations. *See Blundell v. Nihon Kohden America*, No. 15-CV-1503, 2018 WL 4609125, at *10–12, 2018 U.S. Dist. LEXIS 163948, at *26–32 (N.D.N.Y. Sept. 25, 2018) (dismissing the plaintiff's accommodation claims where he failed to present evidence that "he ever actually made a request for these accommodations based on his disability to the appropriate people").

Plaintiff has also failed to make a prima facie showing that she was wrongfully denied an accommodation with respect to medical leave. (*See* Dkt. No. 64, pp. 13–16). Notably, the March 30th note from Plaintiff's doctor vaguely describes the "nature of the illness/injury" as "medical," without any further explanation or reference to her disability. (Dkt. No. 56-13). There is no evidence whatsoever that Plaintiff ever told anyone at BOCES that the medical leave was disability-related or a necessary accommodation, either before or any time after she submitted the notice. Further, there is no evidence that she was denied the

---

[4] Plaintiff offers no evidence whatsoever that she informed BOCES that the requested breaks were necessary to accommodate her disability. (*See* Dkt. No. 64-2, ¶¶ 16–18). Further, Defendant inquired about Plaintiff's alleged request for breaks in an interrogatory, but Plaintiff failed to provide any details as to when and to whom the breaks were allegedly requested. (Dkt. No. 56-4, pp. 5–6).

medical leave; rather the record shows that Plaintiff submitted notice of her medical leave *after* the process for the termination of her employment had already begun. As discussed above, Plaintiff's termination was supported by well-documented evidence that she engaged in workplace misconduct and insubordination. She has not pointed to any authority that BOCES was required to grant her medical leave while in the process of terminating her employment for these reasons.

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff was denied an accommodation for her disability based on her vague request for medical leave while BOCES was in the process of terminating her employment. *See Kho v. New York and Presbyterian Hosp.*, 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018) (finding that the plaintiff failed to establish a prima facie case where there was no evidence that she ever requested an accommodation for her disability); *Clark v. New York State Elec. & Gas Corp.*, 67 F. Supp. 2d 63, 73–75 (N.D.N.Y. 1999) (granting summary judgment on the plaintiff's accommodation claims where she failed to show that her termination for her poor work performance was not a legitimate reason for her firing). Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim.

### C. ADA Retaliation

Plaintiff also appears to allege a retaliation claim under the ADA, with her doctor's note being the protected activity. (*See* Dkt. Nos. 1, ¶ 9; 64, pp. 11–13). Defendant argues that "Plaintiff cannot make out a prima facie claim of retaliation under the ADA because the decision to terminate was made before her first doctor's note." (Dkt. No. 56-26, p. 16). In response, Plaintiff asserts that she can establish a prima facie case because she was "terminated

shortly after Defendant learned her doctor had taken her out," and "Defendant fired Plaintiff to avoid paying her while she was out on leave." (Dkt. No. 64, pp. 12–13).

Retaliation claims brought under the ADA are examined under the three-step *McDonnell Douglas* burden-shifting framework. *Treglia*, 313 F.3d at 719. At the first step, Plaintiff must establish a prima facie case, which requires her to show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Wright v. City of Syracuse*, 611 F. App'x 8, 11 (2d Cir. 2015). Again, the prima facie showing is *de minimis*. *Treglia*, 313 F.3d at 719. "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Id.* at 721. "If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Id.* (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

The first two steps are met for the reasons discussed above. In short, the close temporal proximity between Plaintiff's notice of medical leave and termination is sufficient to make out a prima facie case of retaliation. Defendant's proffered reason for terminating Plaintiff's employment, namely her alleged workplace misconduct and insubordination, is well-documented, legitimate, and non-retaliatory.

Plaintiff's retaliation claim fails at step three of the analysis, for the same reasons discussed above. In particular, the record shows that the decision was made to terminate Plaintiff's employment before her protected activity, and her co-worker Ms. Tianello was also

terminated for misconduct, and without any evidence that she engaged in protected activity. (*See* Dkt. Nos. 56-22, ¶¶ 4, 16, 20–25; 64-15, p. 2; 56-24, ¶¶ 2–4; 56-20; 56-22; 56-23).

In sum, Plaintiff has presented no evidence, aside from temporal proximity, to draw a connection between her notice of medical leave and Defendant's decision to terminate her employment.  This alone is not enough to rebut Defendant's well-documented reasons for the decision to terminate her employment, particularly given the attenuating evidence noted above. Viewing the evidence in the light most favorable to Plaintiff, a jury could not reasonably find that Defendant's stated reasons for the adverse action were a pretext for unlawful retaliation. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA retaliation claim. *See Widomski v. State Univ. of New* York, 933 F. Supp. 2d 534, 553 (S.D.N.Y. 2013) (dismissing the plaintiff's ADA retaliation claim where her claim relied solely on temporal proximity and the plaintiff otherwise failed to rebut the defendant's legitimate, non-discriminatory justification for the plaintiff's termination).

### D.  Title VII Retaliation

Finally, Plaintiff alleges that Defendant unlawfully retaliated against her for reporting alleged sexual harassment that she experienced in the classroom.  (Dkt. No. 1, ¶¶ 11, 30). Defendant argues that Plaintiff cannot make out a prima facie Title VII retaliation claim because she cannot show any causal connection between her complaints and the termination of her employment.  (Dkt. No. 56-26, p. 17).  Defendant points out that Assistant Director Koch and Principal Cooper told Plaintiff that she should not be subjected to the comments of the two minor students," and then "move[d] her to a new classroom for her own protection – an action that contemplated her remaining in employment."  (*Id.*).  Defendant adds that, "[o]ther than temporal proximity, Plaintiff advances no other evidence to show Defendant's rationale for her

termination was a pretext for retaliation based on her complaints of purported sexual harassment." (Dkt. No. 65-4, pp. 9–10).

Title VII prohibits discriminatory retaliation against an employee who complains of a purportedly unlawful practice. 42 U.S.C. § 2000e–3. Like Plaintiff's ADA retaliation claim, her Title VII retaliation claim is also subject to the *McDonnell Douglas* burden-shifting analysis. *See Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015). To make out a prima facie case, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against her; and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive was the but-for cause of the adverse employment action. *Sista*, 445 F.3d at 177; *see also Miller, v. City of Ithaca, New York*, 758 F. App'x 101, 104 (2d Cir. 2018).

Here, Plaintiff has satisfied her *de minimis* burden to demonstrate a prima facie case. Specifically, Plaintiff has established that she reported the sexual comments she received from students to BOCES administrators on March 27, 2015, and Defendant terminated her employment four days later. As explained above, this evidence of close temporal proximity is sufficient to infer causation at the prima facie stage. *See St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 329–31 (E.D.N.Y. 2014) (finding that the plaintiff satisfied her burden to make out a prima facie case for Title VII retaliation by showing temporal proximity between her allegations of sexual harassment and her termination).

At step two, Defendant has adduced evidence that it had legitimate, non-retaliatory reasons for terminating Plaintiff's employment based on misconduct and insubordination. (*See generally* Dkt. No. 56-22). As discussed above, this evidence is sufficient to demonstrate legitimate, non-retaliatory reasons for Plaintiff's termination.

At step three, with the burden shifted back to Plaintiff, she has failed to bridge any connection between her complaints and the termination of her employment. Once again, Plaintiff mainly relies on evidence of temporal proximity, adding conclusory speculation that BOCES did not want to pay her while she was out on medical leave. (Dkt. No. 64, pp. 8–11). As discussed above, temporal proximity alone is not enough at this stage. Plaintiff also argues that her lack of disciplinary history is evidence of retaliatory motive. (*See* Dkt. No. 64, p. 10). However, the lack of any previous disciplinary history does not refute the well-documented evidence of her misconduct and insubordination cited for her termination.

Further, any inference of retaliatory intent is undermined by the record as whole. The undisputed evidence shows that immediately after learning of the students' alleged misconduct, Assistant Director Koch interviewed staff and students with knowledge of what was going on. (Dkt. No. 56-22, ¶¶ 4–6, 16–24). BOCES administrators informed Plaintiff that the students' conduct was inappropriate and should have been reported directly to them. (Dkt. No. 56-22, ¶ 6). They then offered to reassign Plaintiff to a new classroom, "for her own protection from any inappropriate comments." (*Id.*). According to Assistant Director Koch, Plaintiff resisted their decision to reassign her to a new classroom. (*Id.*, ¶¶ 7, 10). The investigation later revealed that Plaintiff and the classroom teacher had been text messaging throughout the school day, including inappropriate and unprofessional discussion about other classroom staff and students. (*See generally* Dkt. No. 56-11). According to Defendant, it was the culmination of events during the investigation and the administrators' conclusions after the investigation that led to their decision to terminate Plaintiff's employment, not because she reported complaints to them. (Dkt. Nos. 56-22, ¶ 24; 56-24, ¶¶ 2–4). And as discussed above, Plaintiff's co-worker Ms. Tianello was also terminated for mostly the same conduct.

26

In sum, viewing the facts in the light most favorable to Plaintiff, a jury could not reasonably find that Defendant's stated reasons were pretextual and that unlawful retaliation was the but-for cause of her termination. *See Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272–74 (E.D.N.Y. 2019) (dismissing the plaintiff's Title VII retaliation claim where she failed to present sufficient evidence of causation, other than temporal proximity and speculation, to rebut the defendant's legitimate reason for the alleged adverse action); *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 249–52 (N.D.N.Y. 2010) (same). Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim under Title VII.

## V. CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 56) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and finally, it is

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:   March 3, 2020
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge